IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CR-321-D
No. 5:15-CV-42-D

GREGORY BARTKO,                      )
                                     )
             Petitioner,             )
                                     )
       v.                            )      **ORDER**
                                     )
UNITED STATES OF AMERICA,            )
                                     )
             Respondent.             )

On November 1, 2010, Gregory Bartko ("Bartko" or "petitioner") stood trial accused of one

count of conspiracy to commit mail fraud, money laundering, and the sale of unregistered securities,

four counts of mail fraud and aiding and abetting, and one count of selling unregistered securities

and aiding and abetting. The superseding indictment essentially charged Bartko with leading an

interstate criminal scheme "to profit from fraudulent sales of investments to individual members of

rural Baptist churches and others, and to conceal those profits." [D.E. 30] 1. The investments

primarily concerned two private equity funds that Bartko, a long-time securities lawyer and securities

dealer in Atlanta, Georgia, created named the Caledonian Fund and the Capstone Fund. Ultimately,

the trial focused on Bartko's knowledge, intent, and good faith. On November 18, 2010, after a

thirteen-day trial, a jury convicted Bartko of all six counts.

On July 1, 2011, Bartko moved for a new trial alleging that the government violated Brady

v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). Thereafter,

Bartko supplemented his motion for a new trial with additional motions. On January 17, 2012, in

a 120-page order, the court denied Bartko's motions for a new trial [D.E. 246]. On April 4, 2012,

the court sentenced Bartko to 60 months' imprisonment on counts one and six and 216 months' consecutive imprisonment on counts two, three, four, and five [D.E. 257, 260]. Bartko appealed [D.E. 262]. On August 23, 2013, the United States Court of Appeals for the Fourth Circuit affirmed Bartko's conviction, Bartko's sentence, and this court's denial of Bartko's motions for a new trial. See United States v. Bartko, 728 F.3d 327 (4th Cir. 2013). On January 27, 2014, the Supreme Court denied Bartko's writ of certiorari. See Bartko v. United States, 571 U.S. 1183 (2014).

On January 26, 2015, Bartko moved under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence [D.E. 292]. On January 27, 2015, Bartko filed an amended motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence [D.E. 295]. On July 6, 2015, the government moved to dismiss, or alternatively for summary judgment concerning, Bartko's section 2255 motion [D.E. 301] and filed a memorandum in support [D.E. 302]. On July 27, 2015, Bartko moved to amend his section 2255 motion [D.E. 305]. On August 4, 2015, Bartko filed numerous exhibits in support of his amended section 2255 motion [D.E. 310]. On September 16, 2015, the court granted Bartko's motion to amend and dismissed as moot the government's motion to dismiss because the motion concerned Bartko's original section 2255 motion [D.E. 316]. On November 25, 2015, the government moved to dismiss, or alternatively for summary judgment concerning, Bartko's amended section 2255 motion [D.E. 321] and filed a memorandum in support [D.E. 322]. On December 30, 2015, Bartko responded in opposition and cross-moved for summary judgment [D.E. 327, 328]. On January 13, 2016, the government replied [D.E. 329]. On January 19, 2016, Bartko moved for discovery [D.E. 330]. On January 20, 2016, the government responded in opposition to Bartko's cross-motion for summary judgment [D.E. 331]. On February 2, 2016, the government responded in opposition to Bartko's motion for discovery [D.E. 332]. On February 10, 2016, Bartko replied concerning his cross-motion for summary judgment [D.E. 335].

2

On March 28, 2018, Bartko moved for leave to file supplemental Brady claims [D.E. 339] and filed a memorandum in support [D.E. 340]. On May 9, 2018, the government moved to dismiss Bartko's supplemental Brady claims [D.E. 343] and filed a memorandum in support [D.E. 344]. On May 23, 2018, Bartko responded in opposition [D.E. 345]. On June 6, 2018, the government replied [D.E. 346]. On June 8, 2018, Bartko moved for leave to file a surreply [D.E. 347]. On June 19, 2018, the court granted Bartko's motion to file a surreply [D.E. 350]. As explained below, the court denies Bartko's motion for leave to file supplemental Brady claims, denies Bartko's motion for discovery, grants the government's motion for summary judgment, denies Bartko's cross-motion for summary judgment, and dismisses Bartko's section 2255 claims.

I.

During Bartko's thirteen-day trial, 31 witnesses testified for the government, and the government introduced 366 exhibits. This court's 120-page order denying Bartko's motions for a new trial exhaustively recounts many aspects of the trial record that led to Bartko's conviction. See [D.E. 246]. That 120-page order also recounts the various witnesses, non-witnesses, and entities associated with Bartko's case. See id. Familiarity with that 120-page order and the entire record is presumed. Moreover, Bartko's latest motions have (again) prompted this court to review the entire record.

Bartko asserts eighteen claims. See [D.E. 292, 305]. Bartko alleges that documents that he obtained through the Freedom of Information Act ("FOIA") contain material information, and he asserts that the documents show that the government violated Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959). Bartko argues that his section 2255 claims, combined with the issues raised in his motions for a new trial and his direct appeal, demonstrate prejudice and that the court should vacate his conviction.

3

A.

Summary judgment is appropriate when, after reviewing the record as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007).

A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for the factfinder to return a verdict for that party. Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248.

In reviewing a section 2255 motion, the court is not limited to the motion itself. The court also may consider "the files and records of the case." 28 U.S.C. § 2255(b); see United States v.

4

McGill, 11 F.3d 223, 225–26 (1st Cir. 1993). Likewise, a court may rely on its own familiarity with the case. See, e.g., Blackledge v. Allison, 431 U.S. 63, 74 n.4 (1977); United States v. Dyess, 730 F.3d 354, 359–60 (4th Cir. 2013).

B.

Bartko did not raise his eighteen claims on direct appeal. Thus, Bartko procedurally defaulted his claims unless he can show "cause" and "actual prejudice" or that he is "actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998); see Massaro v. United States, 538 U.S. 500, 504 (2003); United States v. Fugit, 703 F.3d 248, 253 (4th Cir. 2012); United States v. Sanders, 247 F.3d 139, 144 (4th Cir. 2001); United States v. Mikalajunas, 186 F.3d 490, 492–93 (4th Cir. 1999).

"Cause" requires a showing that "something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel" prevented the defendant from raising the claim on direct appeal. Mikalajunas, 186 F.3d at 493; see Murray v. Carrier, 477 U.S. 478, 488 (1986). "Prejudice" requires a showing that the alleged errors at defendant's trial worked "to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis omitted); see McCarver v. Lee, 221 F.3d 583, 592 (4th Cir. 2000). In the context of a Brady claim, "a petitioner shows 'cause' when the reason for his failure to develop facts . . . was the [government's] suppression of the relevant evidence." Banks v. Dretke, 540 U.S. 668, 691 (2004). A petitioner shows "prejudice" when "the suppressed evidence is 'material' for Brady purposes." Id. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id.

5

To show actual innocence, the petitioner "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley, 523 U.S. at 623 (quotations omitted). When a defendant did not argue actual innocence on direct appeal, he may not do so in support of a section 2255 motion unless he can show by clear and convincing evidence that he is factually innocent of the offense for which he was convicted. See Bousley, 523 U.S. at 623; United States v. Pettiford, 612 F.3d 270, 282 (4th Cir. 2010).

II.

Bartko's first, second, third, fourth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fifteenth, and seventeenth claims allege that the government violated its obligations under Brady, Giglio, or Napue. To prove a Brady violation, Bartko must show three elements: "(1) that the evidence is favorable, either because it is exculpatory or impeaching; (2) that the government suppressed the evidence; and (3) that the evidence was material to the defense." United States v. Higgs, 663 F.3d 726, 735 (4th Cir. 2011); see Turner v. United States, 137 S. Ct. 1885, 1893 (2017); Smith v. Cain, 565 U.S. 73, 75 (2012); Banks, 540 U.S. at 691; Strickler v. Greene, 527 U.S. 263, 281–82 (1999); Giglio, 405 U.S. at 154–55; Brady, 373 U.S. at 87; United States v. Robinson, 627 F.3d 941, 951–53 (4th Cir. 2010). Evidence is favorable if it "it may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682; see Turner, 137 S. Ct. at 1893; Smith, 565 U.S. at 75; Moseley v. Branker, 550 F.3d 312, 318 (4th Cir. 2008).

A "conviction obtained through use of false evidence, known to be such by representatives" of the government, violates due process. Napue, 360 U.S. at 269. A party asserting a Napue claim must prove that the evidence is both false and material and that the prosecutor knew that the

6

evidence was false. See, e.g., Basden v. Lee, 290 F.3d 602, 614 (4th Cir. 2002). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); see Giglio, 405 U.S. at 153–54; United States v. Chavez, 894 F.3d 593, 601 (4th Cir. 2018); Elmore v. Ozmint, 661 F.3d 783, 830 (4th Cir. 2011).

"[T]he materiality of suppressed evidence is considered collectively, not item by item." Moseley, 550 F.3d at 318 (quotation omitted); see Turner, 137 S. Ct. at 1893–94; Kyles v. Whitley, 514 U.S. 419, 436–37 & n.10 (1995); Juniper v. Zook, 876 F.3d 551, 567–68 (4th Cir. 2017); Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1334 (11th Cir. 2009); Campbell v. Polk, 447 F.3d 270, 276 (4th Cir. 2006); McHone v. Polk, 392 F.3d 691, 697 (4th Cir. 2004); United States v. Arias, 217 F.3d 841, 2000 WL 933010, at *6 (4th Cir. July 10, 2000) (per curiam) (unpublished table decision); United States v. Ellis, 121 F.3d 908, 916–18 (4th Cir. 1997). The fundamental inquiry under Brady and Giglio is whether the court has confidence in the outcome of the trial. See Turner, 137 S. Ct. at 1893–95; Smith, 565 U.S. at 75; Kyles, 514 U.S. at 434–35; Bagley, 473 U.S. at 682; Higgs, 663 F.3d at 735.

A.

Bartko first alleges that the government violated Brady by not disclosing Special Agent Fleming's handwritten notes from an interview with government witness Mark Winn. Bartko argues that there are material differences between Special Agent Fleming's handwritten notes and the FBI 302 report concerning the interview that the government produced during discovery. See [D.E. 292] 13–16; [D.E. 305] 6–7.

Winn testified during the government's case-in-chief. Winn worked for the Financial

Industry Regulatory Authority ("FINRA") and was responsible for ensuring that information was properly maintained in FINRA's Central Registration Depository System ("CRD"). Winn testified that CRD is a computer system that houses information concerning licensing, qualifications, and disciplinary proceedings of registered broker-dealer firms and their employees. [D.E. 282-1] 108–11. CRD allows employers or users to run a pre-hire search of an individual that they are contemplating hiring to see if that individual has any prior disciplinary proceedings or any other reportable events, such as customer complaints or terminations. See id. at 114–15, 127–30. The user must get consent from the individual being searched and affirm that they are considering the individual for employment. See id. at 118–19. Winn testified that after the user runs the CRD search, the user would first see a composite information page that included the individual's name, address, and other general information. See id. at 127–28. If an individual had any "disclosure accounts" (i.e., reportable events or disciplinary proceedings), those accounts would be summarized at the bottom of the composite page. See id. at 128. If a user wanted to access the details of the disclosures, the user would need to look to the left side of the screen, which contained different links, and click on the link that said "disclosures." See id.

On January 15, 2004, Bartko searched CRD for records concerning John Colvin. See [D.E. 193] 148, 162–64. On January 16, 2004, Bartko conducted a second record search on Colvin. See id. On February 17, 2004, Bartko searched CRD for records concerning Scott Hollenbeck. See id. at 157. Bartko became involved with Colvin when Colvin sent Bartko promotional materials via telefax concerning Webb Group and the financial products it offered. See [D.E. 246] 5. The promotional material contained references to guaranteed, fixed returns of 14.4 percent and included other indicators of fraud, such as the claim that the investments were protected by the Securities Investor Protection Corporation. Id. The material identified Hollenbeck as president of Webb

8

Group. Hollenbeck was Colvin's business partner and top salesman. Id. Winn testified that CRD records concerning Hollenbeck referenced fraud and other reportable events. See [D.E. 282-1] 132–37. Winn also testified that CRD records concerning Colvin referenced fraud and other reportable events. See id. at 137–43.

Bartko admitted at trial that he checked the box on the CRD records indicating that he was considering Colvin and Hollenbeck for employment to gain access to Colvin's and Hollenbeck's records, even though those representations were false. See [D.E. 193] 162–64. Bartko also testified that he only viewed the composite screen when he searched Colvin and Hollenbeck and that he did not remember reviewing any further details concerning either Colvin or Hollenbeck. See id. at 15–17, 148–150.

Bartko alleges that Special Agent Fleming's handwritten notes from his interview with Winn contain "favorable" statements that reveal the complexity of the CRD system. Bartko argues that he would have used this information to cross-examine Winn concerning the complexities of CRD and to show that Bartko likely saw only limited information concerning Hollenbeck and Colvin. See [D.E. 292] 14; [D.E. 305] 6–7. In support of this argument, Bartko alleges the following variances between Special Agent Fleming's handwritten notes and the FBI 302 report:

- The initial screen on the CRD system is a composite screen that shows limited information such as name, date of birth, resident and business address, a link to disciplinary and reportable events. The interview notes show that if someone wants to actually review the disciplinary and reportable events, there is a lengthy process involved—it is not simply a matter of looking at one page that immediately reveals this information.

- In describing "reportable disclosures" available in the CRD system, Winn remarked (as reported in SA Fleming's notes but not in the 302) that there were none shown which related to Hollenbeck's termination in 2002, with Winn's explanation being "no—just reason for termination they have responsibility to submit the termination disclosure. No trigger yet."

9

- In describing other "reportable events" available in the CRD system, Winn remarked (as reported in SA Fleming's notes but not the 302) that some events were not "in the system in 2004."

- In describing termination comments available in the CRD system with regards to Colvin, Winn remarked (as reported in SA Fleming's notes but not the 302) that firm comments are not required and would not have appeared on the initial screen. Winn further remarked that one would have to go to the "prior employment screen" for that information.

- Winn mentioned in his interview that Colvin had a customer complaint in July 2004 (reported in SA Fleming's notes but not in the 302), but that was not accessible in early 2004 when Bartko accessed the CRD records.

- In Winn's discussion of "non-reportable customer complaints," Winn said customer complaints are reportable only for two years and then are accessible only in the archived section. Winn also said that Colvin's record would have shown at least one customer complaint of historical nature.

[D.E. 292] 14–15.

Even viewing the evidence in the light most favorable to Bartko, Fleming's handwritten notes are not favorable. Moreover, the notes are not exculpatory, and they do not contain impeachment material because the handwritten notes, the FBI 302 report, and Winn's testimony are consistent. See, e.g., McHone, 392 F.3d at 701.

As for the first and fourth alleged variance, Winn testified that a user performing a search in the CRD system would first see a composite information page. See [D.E. 282-1] 127–30. Winn also testified that if an individual had any "disclosure accounts" (i.e., reportable events), those accounts would be listed at the bottom of the composite page. See id. at 128. If an individual wanted to access the disclosures, the individual would need to look to the left side of the screen which contained different links and click on the link that said "disclosures." See id. This statement comports with the FBI 302 report. See [D.E. 303-1] 2 ("The navigation page would lead [the user]

10

to a 'composite screen' . . . . A 'hyperlink' would then connect the searcher to details concerning the disclosures.").

As for the second alleged variance, Bartko omits that, right before the sentence he cites, the handwritten notes state that Winn saw a "full termination in May 2002" for Hollenbeck. See [D.E. 292-1] 6.

As for the third alleged variance, this information comports with Winn's testimony. Winn testified that some reportable events in Colvin's and Hollenbeck's CRD reports were not in the system in 2004. See [D.E. 282-1] 138–40.

As for the fifth alleged variance, Bartko fails to explain how this information would provide him with impeachment material. Winn testified that a customer filed a complaint concerning Colvin in 2003 and that the complaint would have been available when Bartko searched for Colvin in January 2004. See [D.E. 282-1] 143. Winn's statement that there was an additional customer complaint filed in July 2004 that would not have been available at the time Bartko searched for Colvin is irrelevant and has no impeachment value because it does not conflict with Winn's testimony.

As for the sixth alleged variance, this information comports with Winn's testimony. Winn testified that "[c]ertain types of customer complaints are only to be reported for up to two years." [D.E. 282-1] 129. Accordingly, Bartko's claim fails.

In any event, even viewing the evidence in the light most favorable to Bartko, the evidence is not material. See, e.g., Turner, 137 S. Ct. at 1893–95. The government introduced substantial other evidence showing that Bartko was aware of Hollenbeck's lies and fraudulent fundraising methods. See [D.E. 246] 5–20. Accordingly, there is no reasonable probability that, had this

11

evidence been disclosed, the result of Bartko's trial would be different. See, e.g., Turner, 137 S. Ct. at 1893–95.

B.

In his second claim, Bartko alleges that the government violated Brady by not disclosing Postal Inspector Carroll's handwritten notes from an interview of SEC enforcement attorney Alex Rue. See [D.E. 292] 16–17; [D.E. 305] 8–9. Rue represented the SEC in its case against Mobile Billboards of America, Inc. ("Mobile Billboards") concerning fraudulent investment products, a case that involved Scott Hollenbeck, Mobile Billboards's top salesman. See [D.E. 282-5] 103–04, 113. Bartko represented Hollenbeck in the SEC case involving Mobile Billboards. See id. at 106.

Bartko alleges that the notes contain exculpatory information and that there are variances between Carroll's notes and the memorandum of interview ("MOI") from the interview that the government produced to Bartko during discovery. Specifically, Bartko contends that Carroll's notes state that Rue told the "interviewers—including the AUSAs in this case—that he 'did not believe that Bartko knew that Hollenbeck was selling securities for Bartko.'" [D.E. 292] 16–17. Bartko contends that these notes reveal that the chief SEC investigator believed that Bartko was unaware of Hollenbeck's fraudulent activities. See id. at 17. Bartko also cites numerous other statements from Carroll's notes that he contends are favorable to him. See [D.E. 305] 8–9.

Carroll's notes are not favorable to Bartko. See, e.g., McHone, 392 F.3d at 702. Carroll's notes do not state, as Bartko contends, that Rue did not believe that Bartko knew Hollenbeck was selling securities for Bartko. Rather, Carroll's notes state that "I did not believe GB—knew [redacted] was sending GB signed checks not consistent w/ being finder" [D.E. 292-2] 4. This statement means that Rue did not believe Bartko, and Rue knew that Bartko was receiving checks from Hollenbeck in a manner not consistent with being a finder. Moreover, Carroll's notes are

12

inculpatory. The notes state that "[Redacted] admits to using forged doc—GB in room, hears this, and not withstanding sends him to sell for him," and "[w]orking through Capstone—realized GB was dishonest w/ SEC—After received documents w/ rejected investors—Then [redacted] calls me and tells me GB did not return $ it was sent to LRM + returned to him." [D.E. 292-2] 3, 5. Carroll's notes also state that "[n]ow know GB involved in 2 offerings, tied to SBH [redacted]—two people I was investigating." Id. at 4. Accordingly, Bartko's second claim fails. See, e.g., McHone, 392 F.3d at 702.

C.

In his third claim, Bartko argues that the government withheld material information concerning John Colvin that Bartko could have used to impeach Colvin's statements that were introduced at trial under the co-conspirator hearsay exception. See [D.E. 292] 17–19; [D.E. 305] 9–11. (Colvin did not testify at trial.) Specifically, Bartko contends that there are material variances between Inspector Carroll's notes and the 10-page MOI produced to Bartko during discovery concerning statements that Colvin made during an interview with Carroll and Special Agent William DeSantis of the Internal Revenue Services. See id. Bartko argues that Carroll's notes "include statements which are exculpatory and impeaching to statements admitted during Petitioner's trial and attributed to the Petitioner as a co-conspirator under Fed. R. Evid. 801(d)(2)(E)." [D.E. 305] 10. Bartko identifies the following alleged variances:

(i) Carroll's notes reflect that Colvin signed the AIG surety bond application on March 2, 2004 as the general partner of the Franklin Asset Exchange, whereas the MOI reflects that Colvin refused the request by Hollenbeck and Bartko that he do so; (ii) Carroll's notes reflect that Hollenbeck and his wife were cooperating with the prosecution and that Colvin raised questions about why the Hollenbecks were not being indicted; (iii) Carroll's notes refer to lies during the interview, fake statements and lies from witnesses, whereas there are no such references in Carroll's MOI; and (iv) Carroll's notes include no mention by Colvin that Bartko prepared the offering materials for Webb Group Financial and the Franklin Asset Exchange, whereas

13

specific reference is included to that effect in Carroll's MOI.

[D.E. 292] 18–19.

As for the first alleged variance, Bartko is incorrect. Carroll's notes do not state that Colvin signed the AIG surety bond application. To the contrary, Carroll's notes state that "[Colvin] [d]id not sign bond application in March '04—[he] was not a General Partner in FAE. Bartko & SBH asked [him] to use [his] name—[he] refused—[he] was still a registered investment advisor." [D.E. 292-3] 14. This notation comports with the MOI. See [D.E. 303-2] 4. In any event, this information is not favorable or material.

As for the second alleged variance, even assuming such variance exists, Bartko fails to explain how such variance is favorable or material. The notes do not contain exculpatory evidence. To the extent that the notes contain any impeachment evidence, such evidence is not material because it is cumulative. Defense counsel thoroughly impeached Hollenbeck about his desire to receive a cooperation-based reduction in his 168-month prison sentence stemming from the fraud involving Mobile Billboards. See, e.g., Turner, 137 S. Ct. at 1893–95; United States v. Parker, 790 F.3d 550, 558 (4th Cir. 2015); McHone, 392 F.3d at 700; Ellis, 121 F.3d at 917 n.10; United States v. Hoyte, 51 F.3d 1239, 1243 (4th Cir. 1995). Defense counsel also explored at great length and with absolutely devastating effect Hollenbeck's character for untruthfulness. See [D.E. 246] 107–08. Thus, there is no reasonable probability that any additional impeachment evidence concerning Hollenbeck would have resulted in a different verdict. See, e.g., Turner, 137 S. Ct. at 1893–95; Kyles, 514 U.S. at 435; Bartko, 728 F.3d at 338–39.

As for the third alleged variance, Bartko does not cite any alleged lie or false statement or explain how any alleged lies are Brady material. Thus, Bartko's allegation is too vague and conclusory to show a Brady violation. See, e.g., United States v. Eason, 829 F.3d 633, 638 n.5 (8th

14

Cir. 2016); United States v. Soto-Mendoza, 641 F. App'x 691, 694 (9th Cir. 2016) (per curiam) (unpublished). Moreover, despite Bartko's contentions, Inspector Carroll's MOI is consistent because it reflects Colvin's statements that he knew Hollenbeck was lying to investors, using a fake surety bond, and discussing investments with Wells Fargo. Compare [D.E. 303-2] 4–5, with [D.E. 328] 13. Accordingly, Bartko's claim fails.

As for the fourth alleged variance, there is no inconsistency. Carroll's notes state that "[redacted]—had a segment private placement memo for Webb Group or FAE" above which Carroll wrote "believe Bartko wrote it." [D.E. 292-3] 14. This notation comports with Carroll's MOI which states, "Colvin stated that Hollenbeck had a PPM for FAE and Webb Group that he believes was written by Bartko." [D.E. 303-2] 3. Accordingly, the evidence is not favorable to Bartko.

In Bartko's amended motion to vacate, he raises a fifth alleged variance. See [D.E. 305] 10–11. Specifically, Bartko contends that Carroll's notes, dated May 27, 2009, show that the FBI interviewed Colvin in 2003 because Colvin was suspected of selling investments and claiming that a surety bond secured the investments. See id. This evidence, however, is not material. It is merely cumulative impeachment evidence. See Turner, 137 S. Ct. at 1894–95. Moreover, Colvin's statements could be impeached in so many other ways, most notably by using Colvin's 2010 federal conviction for mail fraud and securities fraud. See Parker, 790 F.3d at 558; McHone, 392 F.3d at 700; Ellis, 121 F.3d at 917 n.10; Hoyte, 51 F.3d at 1243; cf. United States v. Colvin, 467 F. App'x 181 (4th Cir. 2012) (per curiam) (unpublished). Thus, there is no reasonable probability that impeachment material concerning Colvin's alleged involvement in a fraudulent investment scheme in 2003 would have changed the outcome of Bartko's trial. See, e.g., Turner, 137 S. Ct. at 1893–95.[1]

---

[1] Bartko also asserts that the FOIA action revealed that there are as many as eight additional witness MOIs that the government did not disclose to him. See [D.E. 305] 10. Bartko's speculation and conjecture fail to state a claim for a Brady violation. See, e.g., United States v. Garcia-Martinez,

## D.

In Bartko's fourth claim, he argues that the government withheld written instructions that the government provided to law enforcement concerning the process to follow when contacting prospective witnesses. See [D.E. 292] 19–20; [D.E. 292-4]; [D.E. 303-4]. In his amended motion, Bartko cites additional case notes. See [D.E. 305] 11–12; [D.E. 310-2]. The case notes include a list of 20 individuals that the government contacted to determine whether they met the definition of "victim" for sentencing purposes and a summary of an interview with John Ricci, one of the government's witnesses at Bartko's sentencing. See [D.E. 310-2]. Bartko argues that these instructions and notes evince the "government's misconduct in avoiding the documentation of Brady information and its pattern of insulating from Petitioner's defense what could be (and is shown to be) materially exculpatory evidence." [D.E. 305] 12.

Even viewing the record in the light most favorable to Bartko, the cited evidence is not favorable or material. The government created the instructions in preparation for Bartko's sentencing. See [D.E. 322] 20. Bartko argued at sentencing that his fraud did not involve 50 or more victims. See [D.E. 276] 10. Accordingly, the government needed to interview witnesses who could describe Hollenbeck's and Bartko's fraud. Nonetheless, even if some of the victims that the agents contacted did not remember Hollenbeck's and Bartko's fraud (and thus did not testify at Bartko's sentencing), such information was not material to whether there were 50 or more victims. Moreover, to the extent that Bartko contends that these documents show that the offense did not involve 50 or more victims, that claim also fails. Bartko raised and lost this claim on direct appeal. See Bartko, 728 F.3d at 346. Bartko cannot use section 2255 to recharacterize and relitigate a claim

730 F. App'x 665, 673 (10th Cir. 2018) (unpublished); United States v. Pearson, 676 F. App'x 202, 203 (4th Cir. 2017) (per curiam) (unpublished); United States v. Caro, 597 F.3d 608, 619 (4th Cir. 2010).

he lost on direct appeal. See Frady, 456 U.S. at 164–65; Dyess, 730 F.3d at 360; United States v. Roane, 378 F.3d 382, 396 n.7 (4th Cir. 2004); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam). Accordingly, this claim fails.[2]

E.

In Bartko's sixth claim, he argues that undisclosed notes from the FBI's interview with David Lewis, one of Wes Covington's law partners, contain material exculpatory evidence. See [D.E. 292] 21; [D.E. 305] 13–14.[3] Covington was Bartko's co-counsel when Bartko represented Hollenbeck in regulatory matters concerning Mobile Billboards and also was involved in various other fraudulent schemes with Bartko before committing suicide. See [D.E. 246] 15–16, 19–23, 26, 28–29, 33, 44, 46–48, 64, 67, 74–79.

Bartko alleges that the notes are exculpatory because they show that Hollenbeck asked Wes Covington (and not Bartko) to provide "lulling" letters to the Gospel Light Baptist Church. See [D.E. 305] 13. According to Bartko, this information evinces that he did not know of, or participate in, Hollenbeck's fraudulent schemes. See id. Bartko also argues that he would have used this evidence to oppose Lewis's motion to quash the subpoena Bartko served on Lewis's law firm, which sought recorded conversations between Covington and Hollenbeck. See id. at 13–14.

Even viewing the record in the light most favorable to Bartko, the Lewis interview notes are not favorable. Lewis was not involved with Bartko's, Hollenbeck's, and Covington's fraudulent dealings. Lewis did not state that Bartko did not participate in "lulling" churches and other investors. See [D.E. 310-3]; [D.E. 303-6]. Rather, Lewis's statement speaks only to Lewis's lack of knowledge

---

[2] Bartko also references notes to other withheld witness interviews. See [D.E. 305] 9–10. Bartko's conclusory references are insufficient to state a claim. See, e.g, Pearson, 676 F. App'x at 203; Caro, 597 F.3d at 619.

[3] Bartko withdrew his fifth claim. See [D.E. 305] 12–13.

concerning Bartko's involvement, and the "favorableness prong of Brady requires more." United States v. Sipe, 388 F.3d 471, 487 (5th Cir. 2004); United States v. Dillman, 15 F.3d 384, 390 (5th Cir. 1994). Alternatively, Lewis's statements are not material. See, e.g., Turner, 137 S. Ct. at 1893–95. Lewis's statements that he did not know about Bartko's involvement with "lulling" churches and other investors are insignificant because Lewis was not involved in the fraud. See, e.g., United States v. McCoy, 348 F. App'x 900, 902 (4th Cir. 2009) (per curiam) (unpublished) ("It is quite clear that evidence that merely contradicts a legally-insignificant witness statement or fact offered by the Government is, by definition, immaterial."). The mountain of evidence marshaled against Bartko demonstrated his guilt beyond any shadow of a doubt. See [D.E. 246] 118–19. Accordingly, there is no reasonable probability that a statement from an uninvolved third party would have affected the outcome of Bartko's trial. See, e.g., Turner, 137 S. Ct. at 1893–95; United States v. Sanchez, 118 F.3d 192, 196–97 (4th Cir. 1997). Thus, Bartko's claim fails.

F.

In Bartko's seventh claim, he argues that the undisclosed MOI and Inspector Carroll's notes from an interview with SEC broker-dealer examiner Gannon Lasseigne contain exculpatory evidence. See [D.E. 292] 21–22; [D.E. 305] 14–16. Lasseigne worked on the SEC's broker-dealer examination of Capstone Partners, a registered broker-dealer that Bartko owned.

Lasseigne did not testify at trial. Nonetheless, Bartko argues that, if the MOI were disclosed, he would have called Lasseigne as a defense witness and used Lasseigne to:

corroborate [his] testimony describing the nature of the SEC examination, to establish through an SEC witness the sheer volume of information and material Bartko provided during the examination; and to demonstrate that the testimony given by witness David McClellan was at variance with Lasseigne's recollection. Perhaps most importantly, Lasseigne's testimony could have been used by Bartko to further establish the false and misleading statements made to Bartko by Rue and McClellan as to the purpose of the broker-dealer examination and the fact that information

18

obtained from Bartko as a result of the SEC's misrepresentations was obtained for use by AUSA Wheeler in Bartko's prosecution. In addition, Lasseigne's testimony would have contradicted the false denials by witnesses Rue and McClellan to the effect that the selection of the timing of the broker-dealer examination for Capstone Partners, L.C. was due to it being a "cycle exam" rather than a specific request by Rue that the SEC examiners conduct a contrived spot exam.

[D.E. 292] 22.

Bartko's claim is nonsensical. Bartko does not cite where Carroll's notes or the MOI contain the favorable information that he contends exists. See [D.E. 292-6]; [D.E. 303-7]. Specifically, Bartko does not cite, and the court has not found, where the MOI or Carroll's notes state that the SEC made misrepresentations to Bartko to obtain evidence for AUSA Wheeler. Moreover, "Bartko's post-trial creation of a new trial strategy involving the [SEC] does not make evidence supporting that new trial strategy material to the trial that actually occurred." [D.E. 246] 93 n.48 (collecting cases).

The remainder of the information in the MOI and Carroll's notes comport with David McClellan's trial testimony. McClellan was the branch chief of the broker-dealer office of compliance for the SEC in Atlanta and was involved with the SEC's examination of Capstone Partners. McClellan testified that Bartko cooperated during the SEC's investigation and that he never refused to give McClellan access to requested bank statements. See [D.E. 282-7] 81–82. McClellan also testified that he conducted an oversight audit exam of Capstone Partners because Alex Rue had dealt with Bartko in March 2005, believed that there were some issues with Capstone Partners, and asked McClellan to investigate. See id. at 84–85. Accordingly, the notes are not favorable because they comport with Rue's trial testimony. See McHone, 392 F.3d at 702.

In any event, even viewing the record in the light most favorable to Bartko, the MOI and Carroll's notes are plainly unfavorable to Bartko. The MOI states that Lasseigne told Carroll that

there was "an issue of money laundering through Bartko's IOLTA account." [D.E. 303-7] 2. The MOI further states that "Lasseigne stated Bartko's business practices as a whole led him to additional questions and wanting to see all of Bartko's accounts, including his attorney trust account." Id. These details comport with Carroll's handwritten notes. See [D.E. 310-4] 3. Thus, even assuming that the MOI and Carroll's notes contain some favorable information, the notes and the MOI do not constitute Brady material because "the unfavorable portion of the [evidence] would have outweighed any exculpatory value." McHone, 392 F.3d at 702 (emphasis omitted). Accordingly, Bartko's claim fails.

G.

Bartko's eighth claim, tenth, and eleventh claims all concern Scott Hollenbeck. In his eighth claim, Bartko argues that the government withheld an FBI 302 report from an October 15, 2010, interview of C. Scott Holmes—Hollenbeck's former defense counsel—and Holmes's notes from a 2008 interview with Bartko. See [D.E. 292] 22–23. Bartko argues that these materials would have allowed him to more thoroughly impeach Hollenbeck concerning Hollenbeck's desire to assist the government in hopes of receiving a Rule 35 motion for a sentence reduction. See [D.E. 305] 18.

Bartko's claim that the 302 report is favorable is laughable. The 302 report states:

Holmes got the impression that Bartko's warnings to Hollenbeck appeared to be more "CYA" for Bartko's benefit rather than to provide Hollenbeck with real legal guidance. He noted that some of what Bartko was relaying did not make sense in light of the facts as Holmes understood them. Therefore, Holmes became suspicious that Bartko had been mostly interested in benefitting from Hollenbeck by tapping into Hollenbeck's sales charisma and the huge network of sales prospects Hollenbeck had developed.

Holmes stated that during his meeting with Bartko, Bartko informed Holmes that he had consulted with a criminal attorney who advised him to shut down Capstone and refund the money to investors.

[D.E. 303-8] 1–2.

20

In his tenth and eleventh claims, Bartko alleges that the government failed to turn over notes from a June 3, 2010, interview of Hollenbeck, which allegedly contain impeachment evidence. See [D.E. 292] 25; [D.E. 305] 21–22. Bartko also claims that the government failed to disclose that Hollenbeck gave false testimony at Colvin's trial concerning whether Hollenbeck had received promises or benefits for testifying. See [D.E. 292] 26; [D.E. 305] 21–25.

Bartko's eighth, tenth, and eleventh claims all fail because Bartko cannot show that any additional impeachment materials concerning Hollenbeck are material. As this court explained in its 120-page order:

> Scott Hollenbeck was not critical to the government's case, and the government did not rely on his credibility in prosecuting Bartko. Defense counsel's devastating cross examination of Hollenbeck impeached Hollenbeck with multiple categories of impeachment evidence, including (1) Hollenbeck's felony convictions, (2) his bias in favor of the government due to his desire to receive a Rule 35 motion and a reduction in his 168-month prison sentence for his involvement in Mobile Billboards's fraud, (3) his bias in favor of the government due to his desire to avoid being prosecuted for the fraud that he committed with Colvin, Webb Group, Franklin Asset Exchange, Disciples Trust, and others, (4) his bias in favor of the government due to his desire to avoid being prosecuted for the fraud he committed while raising money for the Caledonian Fund and the Capstone Fund, (5) myriad specific instances of lying, fraud, and forgery throughout Hollenbeck's adult life, (6) prior inconsistent statements to prosecutors, (7) contradictions within his trial testimony, and (8) his inability to recall certain facts. After all this, the government could not have relied on Hollenbeck's credibility, for Hollenbeck had none left.

[D.E. 246] 107–08. Indeed, the Fourth Circuit agreed with this court and held that "we do not think that impeachment [of Hollenbeck] could have made an iota of difference in the jury's final judgment." Bartko, 728 F.3d at 337.[4] Accordingly, Bartko's eighth, tenth, and eleventh claims fail.

___

[4] To the extent that Bartko argues that the FBI memorandum is exculpatory because it mentions a meeting between Hollenbeck and Covington without Bartko, see [D.E. 305] 23, that claim also fails. In light of te meetings that Bartko did have with Hollenbeck, Covington, and others, [D.E. 246] 20–34, Bartko fails to explain how a single meeting between Hollenbeck and Covington supports his claim that he was unaware of Hollenbeck's fraudulent fundraising tactics. In any event, the evidence is not material. See Turner, 137 S. Ct. at 1893–95; Bartko, 728 F.3d at 337.

H.

In his ninth claim, Bartko alleges that Special Agent Fleming's handwritten notes from her interviews with Levonda Leamon and Rebecca Plummer contain material variances between the MOIs and FBI 302 report, which were produced to Bartko during discovery. See [D.E. 292] 23–25; [D.E. 305] 18–20. Leamon and Plummer co-owned Legacy Resource Management ("LRM"), a North Carolina corporation that had also been involved with Mobile Billboards. See [D.E. 246] 43–44. Leamon and Plummer started Legacy in 2001 and each owned 50 percent. Legacy was a two-person operation in Kernersville, North Carolina. Leamon was the president and Plummer was the secretary/treasurer. When Mobile Billboards imploded in the summer of 2004, Leamon and Plummer each received a cease and desist order from the North Carolina Secretary of State Securities Division, prohibiting them from selling securities.[5] Thereafter, Legacy struggled financially. Leamon and Plummer sought legal and business advice from Covington and Bartko. Id. at 44. Bartko also worked with Leamon and Plummer to form an "investment club" to allow non-accredited investors to invest in the Capstone Fund, Bartko's private equity fund. See id. at 44–45.

Bartko argues that variances between Fleming's handwritten notes and the MOIs/FBI 302 report show that "the prosecution team engaged in a concerted effort to 'sanitize' the Leamon and Plummer witness statements from evidence favorable to Bartko (impeachment evidence)." [D.E. 292] 24. Specifically, Bartko alleges that Fleming's handwritten notes are impeachment evidence because they state (falsely) that Leamon and Plummer said that they never sold investments other than in Mobile Billboards. See [D.E. 292] 24.[6]

---

[5] Hollenbeck also received a cease and desist order. See [D.E. 246] 11.

[6] Bartko withdrew his claims concerning three other alleged material variances between the notes and the FBI 302 report. [D.E. 305] 19.

Bartko also alleges that the documents evince that Leamon, Plummer, and Hollenbeck engaged in a separate real-estate fraud without Bartko and that the government wrongly tried to connect Bartko to that fraud. See [D.E. 305] 19–20; [D.E. 310-6]. Bartko argues that he could have used this evidence to impeach Plummer and show that her testimony that Bartko prepared promissory notes for a real-estate scheme was false. See [D.E. 305] 20. Bartko contends that he would have used this evidence to show that "the three co-conspirators had absolutely no misgivings about developing an additional fraud scheme" and to support his defense that he "was not aware of the false and misleading investment sales activities." Id.

The court rejects Bartko's claim. Once again, Bartko does not cite where the documents mention a separate fraud involving Leamon, Plummer, and Hollenbeck or where there the documents mention Leamon and Plummer denying selling any investments other than Mobile Billboards. See [D.E. 310-6]; [D.E. 310-11]. The court has reviewed Fleming's notes and did not find such statements. Moreover, even if the notes did discuss a separate fraud involving Leamon, Plummer, and Hollenbeck, the notes comport with Plummer's trial testimony. See [D.E. 282-6] 74–75, 88. Accordingly, Bartko's claim fails. See [D.E. 246] 110–15.

Bartko also cites a page of the handwritten notes that allegedly states that Leamon and Plummer told interviewers that Bartko did not demand that they return the finder's fees paid to LRM. See [D.E. 305] 20; [D.E. 310-11] 14. It is not clear from the notes whether the statement is attributable to Leamon, Plummer, or someone else. Assuming without deciding that the notes are impeaching concerning Plummer's trial testimony because Plummer testified that Bartko did demand LRM return the finder's fees, the notes do not come close to being material. See [D.E. 282-6] 86–87; [D.E. 246] 110–15.[7] Whether or not Bartko demanded that LRM return the finder's fees was

[7] Leamon did not testify concerning the matter.

23

not favorable or material to Bartko's trial. See, e.g., Turner, 137 S. Ct. at 1893–95; McHone, 392 F.3d at 700 ("We are unwilling to find, based on this single, immaterial inconsistency, that the undisclosed evidence is 'favorable' under Brady."). Moreover, in denying Bartko's motion for a new trial, this court found that Leamon's suppressed tolling agreement, a document with greater evidentiary value, was not material. See [D.E. 246] 109–15. This court also flatly rejected Bartko's claim that his trial was a "three-witness trial" involving Hollenbeck, Leamon, and Plummer. See id. at 110. The government presented a mountain of circumstantial evidence of Bartko's criminal intent in the form of documents (including correspondence, emails, bank records, and telephone records) and other witness testimony. Furthermore, Bartko's testimony was incredible, and the jury was entitled not only to disbelieve it, but to believe the opposite. See [D.E. 246] 118–19. Thus, there is no reasonable probability that, had the government disclosed those notes to Bartko, the trial's outcome would have been different. See id. at 110–15; Turner, 137 S. Ct. at 1893–95.

I.

In Bartko's twelfth claim, he alleges that the government violated Brady by not disclosing Inspector Carroll's handwritten notes from a September 25, 2009, interview of government witness Tim Cook. See [D.E. 292] 27; [D.E. 305] 27–29. Tim Cook was a Pastor at Berean Baptist Church, one of the churches from which Hollenbeck and Bartko solicited investments. Cf. [D.E. 246] 38–40 (discussing Pastor Cook's interactions with Bartko and Hollenbeck). Bartko argues that Carroll's notes state that Cook had no knowledge of Bartko or Capstone, while Cook testified that Hollenbeck discussed Capstone in his presentation to the Berean Baptist Church. See [D.E. 292] 27; [D.E. 305] 28.

Again, Bartko misstates the evidence. Carroll's notes do not state that Cook never heard Bartko or Capstone. To the contrary, Carroll's notes state "Church; you Cashier's Check to

24

him—don't think never put in to Capstone." [D.E. 310-9] 1. This sentence comports with Cook's trial testimony. Cook testified that "Capstone was the name that I had in mind that we were supposed to write the check and make it out to Capstone. When [Hollenbeck] called me around the holidays . . . then he said make sure to make it out to Franklin Asset Exchange." [D.E. 282-7] 158–59. In any event, even if Carroll's handwritten notes did not mention Capstone, the notes do not provide Bartko with impeachment evidence because the notes do not contain any prior inconsistent statement. Accordingly, Bartko's claim fails.

J.

In his thirteenth claim, Bartko alleges that the government violated Brady, Giglio, and Napue by eliciting, and failing to correct, false testimony from Hollenbeck concerning a January 31, 2005, confrontational phone call between Bartko and Hollenbeck after Bartko discovered that Hollenbeck embezzled six refund checks. See [D.E. 292] 27–32; [D.E. 305] 29–32. Specifically, Bartko argues that the government introduced evidence concerning this phone call to show that Bartko knew of Hollenbeck's fraudulent activities on January 31, 2005. See [D.E. 292] 28–29. According to Bartko, however, he did not have a confrontational phone call with Hollenbeck until April 12, 2005. See id. at 29.

Bartko procedurally defaulted this claim because he knew his theory concerning the timing of the phone calls when he filed his direct appeal. Cf. [D.E. 246] 54, 70 & n.39. In opposition to this conclusion, Bartko alleges that:

> [n]ewly obtained documents and statements made by SA Fleming during her investigation of phone records and the specific dates and frequency of Petitioner's conversations with Leamon, Plummer and Hollenbeck reveal that: (i) Hollenbeck's testimony which he described in detail evidencing a confrontational phone call with Petitioner and Covington relating to the discovery of embezzled and forged checks by Hollenbeck was false in terms of when the call occurred; (ii) the prosecution, through AUSA Wheeler, clearly knew or should have known the conversations about

25

the embezzled checks did not occur until months later after Petitioner terminated all of his dealing with Hollenbeck—in fact on April 12, 2005; and (iii) AUSA Wheeler not only failed to correct Hollenbeck's testimony on this issue by presenting him with his very own documentation within Hollenbeck's files, but the prosecution failed to disclose to Petitioner's defense the incongruity of the true facts and the false theory propagated by the government.

[D.E. 305] 30.

Bartko offers no support for his assertions. Rather, Bartko cites handwritten notes from interviews with witnesses Susan Smith, Quinn Hopkins, Chrysta Taylor, and Ted Johnson and argues that the interview notes show that the government's phone call summary charts were misleading. See id. at 31–32; [D.E. 310-12–310-15].[8] Bartko fails to identify what portion of the notes support his claim. The court has reviewed the handwritten notes and concludes that the notes do not support Bartko's claim. Accordingly, Bartko has failed to show "cause" to overcome procedural default.

Alternatively, Bartko's claim fails on the merits. Even viewing the record in the light most favorable to Bartko, Bartko has not shown that the government violated Napue because Bartko fails to show that Hollenbeck's testimony was false and that the government knew of the alleged false testimony. See, e.g., Basden, 290 F.3d at 614. To the extent that Bartko argues that the witness interview notes are Brady material, that claim also fails. The notes are not favorable or material. Moreover, Special Agent Fleming testified concerning the limitations of the summary charts. See [D.E. 282-8] 101–02. Thus, Bartko's claim fails.

## K.

In his fifteenth claim, Bartko generally alleges that the government failed to disclose "scores" of MOIs and handwritten notes that contain Brady material. See [D.E. 292] 42–43; [D.E. 305] 35–39. Bartko cites Inspector Carroll's handwritten notes from an October 13, 2010, interview of

---

[8] Bartko also purportedly cites an internal FBI memorandum but fails to cite where on the docket such memorandum has been filed. [D.E. 305] 31.

Pastor McCullough, an investor in Capstone referred by Hollenbeck. See [D.E. 305] 38. Bartko also cites Inspector Carroll's handwritten notes and an MOI from an October 14, 2010, interview of Randolph James, an attorney that represented Leamon and Plummer. See id. at 38–39.

As for Inspector Carroll's interview notes concerning Pastor McCullough, the notes appear to state that Pastor McCullough did not recall ever hearing Bartko's name associated with the investment in Capstone but that he did see Bartko's name on paperwork. See [D.E. 310-17]. The notes also state that Pastor McCullough did not speak with Bartko directly and did not know of Plummer, Leamon, or LRM. See id. Bartko argues that this information supports his defense that "Hollenbeck's continuing fraudulent sales activities were clandestine in nature and designed to dupe [Bartko] into continuing to believe Hollenbeck was acting as a mere finder—not a seller of securities." [D.E. 305] 39.

Bartko fails to explain how Pastor McCullough's statement is favorable. The court concludes that this statement is not favorable because it is not exculpatory and it has no impeachment value. First, Pastor McCullough did not testify. Moreover, Hollenbeck's failure to mention Bartko's name during a conversation soliciting an investment from Pastor McCullough has no relevance to whether Bartko knew of Hollenbeck's fraudulent schemes and the lies he was telling his investors. See, e.g., United States v. Wilson, 624 F.3d 640, 661 (4th Cir. 2010) ("[Witness's] statement fails on both fronts because it has no bearing on [defendant's] participation in the [offense] and therefore provides no information relevant to the offense . . . ."). In any event, this statement is not material. See Turner, 137 S. Ct. at 1893–95. The trial record includes a mountain of documentary evidence and witness testimony that proved Bartko's guilt beyond any reasonable doubt. Accordingly, there is no reasonable probability that one victim's testimony concerning whether Hollenbeck mentioned Bartko during a conversation soliciting an investment would have altered the outcome of Bartko's trial.

As for Inspector Carroll's interview notes concerning James, Bartko lists numerous statements from the notes that he alleges are exculpatory or impeaching. See [D.E. 305] 39; see also [D.E. 328] 39–40. Bartko argues that the notes are favorable because James told Inspector Carroll that (1) LRM acted as an investment advisor; (2) Bartko sent LRM an e-mail thanking LRM for its investment in January 2005; (3) James provided a copy of his LRM file to the government; (4) Bartko was a "very bright guy"; (5) Leamon was "incredibly stupid" not to question the reason for the transactions between LRM and Capstone; (6) James described Plummer as articulate and bright; (7) Leamon and Plummer consulted James about concerns regarding Hollenbeck and Mobile Billboards; and (8) Bartko never implied that LRM did anything wrong. See [D.E. 305] 39; [D.E. 328] 39–40. Bartko fails to explain how any of these statements are exculpatory, and the court concludes that they are not. Furthermore, the notes are inculpatory. See McHone, 392 F.3d at 702. The notes also state that (1) Bartko told James that he was winding down Capstone to "sidestep" the SEC; (2) Bartko told James that multiple individuals told Bartko that he had a conflict of interest in the way he was running Capstone; and (3) Bartko was giving LRM legal advice while it appeared that Bartko was involved in a conspiracy to hide the source of funds he was received. See [D.E. 310-19] 2–3. Accordingly, the court rejects Bartko's argument that the Inspector Carroll interview notes concerning James were favorable to Bartko's defense. See McHone, 392 F.3d at 702.[9]

---

[9] Bartko also argues that James was presented with an e-mail during the interview that corroborates Bartko's testimony that LRM and Hollenbeck agreed to a finder's fee arrangement without Bartko's knowledge. See [D.E. 328] 39–40. After reviewing the e-mail, James told interviewers that Hollenbeck received part of the finder's fee because Hollenbeck introduced LRM to Bartko. See [D.E. 310-19] 2; [D.E. 310-18] 3.

The court rejects Bartko's argument. James also stated that the e-mail informed Bartko that LRM did not have all the money that Bartko had paid them because they had paid Hollenbeck his portion. See id. Thus, contrary to Bartko's assertions, the e-mail that investigators showed to James does not state or imply that Bartko did not know about the arrangement. Instead, the e-mail merely informs Bartko that Hollenbeck had been paid his portion of the fee. Accordingly, Bartko's claim fails. See McHone, 392 F.3d at 702.

As for Bartko's argument concerning any impeachment value of Inspector Carroll's notes concerning his interview of James, Bartko contends that James's statement that Bartko made a formal demand to LRM to return all finder's fees is impeachment evidence. Bartko's claim fails, however, because the alleged statement comports with Plummer's trial testimony. Compare [D.E. 305] 39, with [D.E. 282-6] 86–87. Bartko also argues that James's statement that Bartko contacted LRM to solicit investors for him conflicts with Leamon's testimony because Leamon testified that she was directed to refer potential investors to Bartko. See [D.E. 328] 39. These statements do not conflict.

Bartko also claims that "James apparently provided an entire copy of his LRM file to the government . . . the contents of which were never made available to the defense. These file materials would most likely include a multitude of statements made by Leamon and Plummer to James . . . ." [D.E. 292] 39. This claim is too speculative to state a claim. See Caro, 597 F.3d at 619 ("Because [defendant] can only speculate as to what the requested information might reveal, he cannot satisfy Brady's requirement of showing that the requested evidence would be 'favorable to [the] accused.'").

Bartko also argues that the government failed to comply with its promise of "open file discovery." [D.E. 305] 36–38. The government's failure to comply with an alleged open file discovery policy does not, standing alone, constitute a Brady violation. See, e.g., United States v. Greatwalker, 356 F.3d 908, 911 (8th Cir. 2004).

L.

In his sixteenth and seventeenth claims, Bartko asserts prosecutorial misconduct. See [D.E. 305] 40–45. In claim sixteen, Bartko argues that the materials he received through FOIA show that the scope of prosecutorial misconduct concerning the suppression of Brady materials was far greater than was known at the time of Bartko's motions for a new trial and direct appeal. See id. at 40.

Bartko argues that these additional materials give rise to a "free standing due process claim" and a prosecutorial misconduct claim. Id.

Bartko's sixteenth claim fails. The court has thoroughly reviewed all of Bartko's claims, the FOIA materials, and the record. Even viewing the record in the light most favorable to Bartko, Bartko has not shown that the government violated Brady. See, e.g., Strickler, 527 U.S. at 281.

As for Bartko's seventeenth claim, Bartko argues that AUSA Wheeler falsely stated in a declaration filed with the court that he did not make any statements to Hollenbeck, Crystal Hollenbeck (Hollenbeck's wife), or any attorney for either of them concerning a Rule 35 motion or any other sentencing benefit before jury deliberations in Bartko's trial. See [D.E. 305] 42–45; [D.E. 227-7]. In support, Bartko primarily relies on docket entries from Scott Hollenbeck's case, all of which were available when he filed his notice of appeal.

Bartko procedurally defaulted this claim because the factual basis for his claim was available when he filed his direct appeal. Moreover, Bartko has not shown "cause" to overcome his procedural default.[10] Alternatively, this evidence is not material. As stated, defense counsel thoroughly impeached Hollenbeck about his desire to receive a cooperation-based reduction in his 168-month prison sentence stemming from the Mobile Billboards fraud. Defense counsel also explored at great length and with absolutely devastating effect Hollenbeck's character for untruthfulness. Thus, there is no reasonable probability that any additional impeachment evidence concerning Hollenbeck would have resulted in a different verdict. See Turner, 137 S. Ct. at 1893–95; Kyles, 514 U.S. at 435; Bartko, 728 F.3d at 338.

---

[10] Bartko's argument that he became aware of this claim upon receipt of Special Agent Fleming's notes through his FOIA action fails. In order to show cause, Bartko must demonstrate that "some external impediment prevent[ed] counsel from constructing or raising the claim [on appeal]." Carrier, 477 U.S. at 492. Bartko has failed to allege that some external impediment prevented him from reviewing Hollenbeck's criminal docket and raising this claim on direct appeal.

M.

In his fourteenth claim, Bartko argues that the government violated his due process rights by conducting parallel civil and criminal investigations solely to obtain evidence to use in Bartko's criminal prosecution. See [D.E. 292] 32–42; [D.E. 305] 33–35. Bartko's claim fails. First, Bartko cannot show "cause" to overcome his procedural default. Bartko does not cite any external factor that prevented him for raising this claim on direct appeal. To the contrary, Bartko's cross-examination of SEC attorney Alex Rue shows that Bartko believed that there was improper collusion, at least as of the time of trial. See [D.E. 282-5] 186–89 ("Q: Do you remember talking to a compliance specialist at the NASD about the fact that you are going to try to set up Greg Bartko?"). Despite Bartko's contentions that he was not able to "put the pieces together of the SEC's inappropriate funneling" of records until he received records from FOIA, [D.E. 305] 35, the only alleged evidentiary support Bartko cites is an internal FBI memorandum from March 31, 2005. See [D.E. 310-16]. The court has thoroughly reviewed the FBI memorandum. Even viewing the evidence in the light most favorable to Bartko, it does not support Bartko's claim.

Alternatively, Bartko's claim fails on the merits. The government may conduct parallel civil and criminal investigations "without violating the due process clause, so long as it does not act in bad faith." United States v. Stringer, 535 F.3d 929, 936–37 (9th Cir. 2008); see United States v. Kordel, 397 U.S. 1, 11–12 (1970); United States v. Parrott, 248 F. Supp. 196, 202 (D.D.C. 1965).[11]

---

[11] In Kordel, the Supreme Court rejected the defendant's argument that the government violated his due process rights by conducting parallel investigations. See Kordel, 397 U.S. at 11–13. In doing so the Court stated:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special

31

Bartko dedicates nearly thirteen pages of his motion to discussing alleged improper coordination between the SEC and AUSA Wheeler. Bartko alleges, among other things, that "[r]ecords received by Bartko . . . validate Bartko's assertion that the SEC, the receiver for MBA and AUSA Wheeler coordinated their efforts to gather evidence from MBA and thereafter from Bartko, in order to initiate criminal prosecutions of not only MBA officials, but a follow-on prosecution of Bartko." [D.E. 292] 36. Strikingly, Bartko offers no support for any of his allegations, despite contending that records he received through his FOIA requests support his assertions. Accordingly, Bartko's unsubstantiated allegations fail to support his claim. Cf. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Second, even assuming that the court found improper coordination, the remedy would be to suppress any unlawfully obtained evidence and order a new trial. See United States v. Tweel, 550 F.2d 297, 300 (5th Cir. 1977); United States v. Scrushy, 366 F. Supp. 2d 1134, 1137–40 (N.D. Ala. 2005). Despite alleging that the SEC "intentionally deceived Bartko into waiving his Fifth Amendment right and duped him into providing information directly to AUSA Wheeler for use against him in the criminal investigation," [D.E. 292] 39–40, Bartko does not cite or describe any evidence that AUSA Wheeler obtained as a result of the alleged unlawful coordination between the SEC and AUSA Wheeler that the government used in his criminal trial. Accordingly, Bartko's claim fails.

N.

In his final claim, Bartko argues that he has sufficiently alleged an "actual innocence" claim; therefore, he should be excused from showing cause and prejudice. Bartko's claim fails.

"To establish actual innocence, [a defendant] must demonstrate that, in light of all the

---

circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

Id. at 11–12 (footnotes omitted).

evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley, 523 U.S. at 623 (quotations omitted). When a defendant did not argue actual innocence on direct appeal, he may not do so in support of a section 2255 motion unless he can show by clear and convincing evidence that he is factually innocent of the offense for which he was convicted. See Pettiford, 612 F.3d at 282. "[T]his standard is not satisfied by a showing that a [defendant] is legally, but not factually, innocent." Id.; see Bousley, 523 U.S. at 623. Even viewing the record in the light most favorable to Bartko, no rational factfinder could find that he is factually innocent of the crimes of which he was convicted. Thus, Bartko cannot escape procedural default. In any event, the court considered each of Bartko's claims on the merits and concludes that each claim fails.

O.

The court also must assess the cumulative effect of the evidence on which Bartko based his section 2255 motion.[12] The suppressed evidence is considered collectively for purposes of materiality. Kyles, 514 U.S. at 436 n.10, 454; Juniper, 876 F.3d at 567–68. In making this assessment, the court does not consider evidence that it determines is either not favorable or not suppressed. See Kyles, 514 U.S. at 433, 437–38. As discussed, Bartko failed to show that the majority of evidence he cites is favorable to him because it is not exculpatory or impeaching. Thus, the court only considers references to the FBI's 2003 interview with Colvin, Hollenbeck's false testimony at Colvin's trial, and the statement from Leamon or Plummer that Bartko did not demand that they return the finder's fees paid to LRM. The court considers this evidence in conjunction with the Hollenbeck proffer agreements and the Leamon tolling agreement, which the court considered in ruling on Bartko's motions for a new trial. See [D.E. 246] 117; Schledwitz v. United States, 169

---

[12] The court assumes without deciding that the standard for adjudicating Bartko's Brady claims under Federal Rule of Criminal Procedure 33 and 28 U.S.C. § 2255 are the same. See United States v. Johnson, 380 F. Supp. 2d 660, 670 n.4 (E.D. Pa. 2005).

F.3d 1003, 1012 (6th Cir. 1999).

None of the evidence is exculpatory. Rather, the evidence very slightly would have improved Bartko's ability to impeach Hollenbeck, Colvin, Plummer, and Leamon. In denying Bartko's motion for a new trial, this court explained in painstaking detail why additional impeachment materials concerning Hollenbeck and Leamon would not undermine confidence in the outcome of Bartko's trial. See [D.E. 246] (discussing the immateriality of Leamon's testimony and the already devastating impeachment of Hollenbeck). The Fourth Circuit agreed with this court that additional impeachment of Hollenbeck could not have made an iota of difference in the jury's judgment. See Bartko, 728 F.3d at 337. The Fourth Circuit also agreed that the Leamon tolling agreements were not material because Leamon's testimony served as summary evidence and was corroborated by substantial documentary evidence and other witness testimony. See Bartko, 728 F.3d at 340.

Bartko's newly cited evidence in his section 2255 motion does not change this outcome. The alleged new impeachment evidence concerning Hollenbeck and Colvin is merely cumulative and thus immaterial. See, e.g., Turner, 137 S. Ct. at 1893–95; Parker, 790 F.3d at 558; Hoyte, 51 F.3d at 1243 n.3; Langley v. Chester, 869 F.2d 594, 1989 WL 14199, at *3–4 (4th Cir. 1989) (per curiam) (unpublished table decision). The court also considers Leamon's or Plummer's statement that Bartko did not demand that they return the finder's fees paid to LRM. As stated, it is unclear from the handwritten notes whether Leamon, Plummer, or another unidentified witness made this statement. The court concludes, however, that the evidence does not change the cumulative materiality assessment, regardless of which witness made the statement. There are many reasons why Leamon or Plummer may have made this alleged inconsistent statement that do not bear on the issue of credibility (i.e., misrecollection). Furthermore, the issue concerning whether Bartko demanded that LRM return the finder's fees was immaterial to the trial. See, e.g., Wilson, 624 F.3d

34

at 661. Thus, there is no reasonable probability that this evidence, combined with the cumulative impeachment evidence concerning Hollenbeck and Colvin, would have altered the outcome of Bartko's trial.

Materiality is considered "in light of the evidence adduced against the defendant at trial; when a conviction is supported by overwhelming evidence of guilt, habeas relief is not warranted." Leka v. Portuondo, 257 F.3d 89, 104 (2d Cir. 2001); see Agurs, 427 U.S. at 112–13; Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 561 (4th Cir. 1999). Bartko's case was not close. The evidence against Bartko overwhelmingly demonstrated his guilt. As the court explained in its 120-page order, if the jury had any doubts about Bartko's guilt, Bartko's incredible testimony destroyed them. The jury was permitted not only to disbelieve Bartko's testimony, but to believe the opposite. [D.E. 246] 118–19. The court has thoroughly reviewed the undisclosed evidence in the context of the entire record and in the light most favorable to Bartko. The court concludes that there is no reasonable probability that the undisclosed evidence could have impacted Bartko's trial. See Turner, 137 S. Ct. at 1893–95; Agurs, 427 U.S. at 112–13; Bartko, 728 F.3d at 340–41.

## III.

Bartko moved for leave to file a supplemental Brady claim. In January 2018, investigators from Bartko's defense team located Hollenbeck in Orlando, Florida, and asked him if he would submit to an interview. See [D.E. 339] 2; [D.E. 340] 5. Hollenbeck agreed, and investigators interviewed Hollenbeck twice. See [D.E. 339] 2. After these two initial interviews, Hollenbeck agreed to provide a statement under penalty of perjury. See id. at 3. In his statement, Hollenbeck told investigators that he gave perjured testimony during Bartko's trial and that he did so because he received "veiled threats" from the government that it would prosecute him and his wife for their involvement in Bartko's investment schemes. See id. at 3–4.

Bartko's supplemental <u>Brady</u> claim alleges that (1) Hollenbeck made 21 perjured, false, or misleading statements at trial; (2) the government failed to disclose to Bartko inducements that it offered to Hollenbeck in exchange for his cooperation in Bartko's prosecution; (3) the government "encouraged" Hollenbeck to implicate Bartko in the fake surety bond scheme; (4) the government encouraged Hollenbeck to testify falsely and knowingly allowed (or at least acted with reckless indifference to) Hollenbeck's false testimony concerning any expected benefits he would receive from testifying; and (5) the government failed to correct aspects of Hollenbeck's testimony that they should have known was perjured, false, or misleading. <u>See</u> [D.E. 339] 4–15; [D.E. 340] 5–7.

"On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d); <u>see</u> 28 U.S.C. § 2242. Leave to supplement "should be freely granted, and should be denied only where good reason exists such as prejudice to the defendants." <u>Franks v. Ross</u>, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (quotation and alteration omitted); <u>Walker v. United Parcel Serv., Inc.</u>, 240 F.3d 1268, 1278 (10th Cir. 2001).

Bartko filed his supplemental claims more than four years after his judgment became final. <u>See</u> 28 U.S.C. § 2255(f). Accordingly, Bartko's supplemental <u>Brady</u> claims are untimely unless he can show that his claims relate back to his original pleading. <u>See</u> <u>Mayle v. Felix</u>, 545 U.S. 644, 650, 659–64 (2005); <u>Gray v. Branker</u>, 529 F.3d 220, 241 (4th Cir. 2008); <u>United States v. Pittman</u>, 209 F.3d 314, 318 (4th Cir. 2000); <u>Brizuela v. Clarke</u>, 112 F. Supp. 3d 366, 380–81 (E.D. Va. 2015), <u>appeal dismissed</u>, 633 F. App'x 178 (4th Cir. 2016) (per curiam) (unpublished); Fed. R. Civ. P. 15(c). Under Federal Rules of Civil Procedure Rule 15(c), relation back is allowed when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Bartko has

not met this standard, and Bartko's supplemental Brady claims are untimely. See Mayle, 545 U.S. at 650, 659–64; Gray, 529 F.3d at 241; Pittman, 209 F.3d at 318; Brizuela, 112 F. Supp. 3d at 380–81.

Alternatively, even if Bartko's supplemental Brady claims relate back to his original motion, Bartko's claims fail on the merits. Recantation testimony is "viewed with great suspicion" and, standing alone, is insufficient to set a aside a conviction. See Dobbert v. Wainwright, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting from denial of certiorari) (collecting cases); Byrd v. Collins, 209 F.3d 486, 508 n.16 (6th Cir.2000); Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir. 1975); United States v. Johnson, 487 F.2d 1278, 1279 (4th Cir. 1973) (per curiam). Indeed, "suspicions are even greater when . . . the recanting witness is one who was involved in the same criminal scheme and, having received the benefit of his cooperation agreement," has nothing left to lose. Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007). When a witness recants testimony, the court may grant relief only when it is "reasonably well satisfied" that the testimony was actually false. See Nix v. Whiteside, 475 U.S. 157, 183 n.3 (1986) (Blackmun, J., concurring); United States v. Roberts, 262 F.3d 286, 293 (4th Cir. 2001). Thus, if the court disbelieves the recantation testimony, the court must reject the claim. See, e.g., Roberts, 262 F.3d at 293; United States v. Grey Bear, 116 F.3d 349, 351 (8th Cir. 1997); United States v. Mahdi, 172 F. Supp. 3d 57, 68 (D.D.C. 2016).

The court does not believe Hollenbeck's recantation statements. First, Scott Hollenbeck is one of the least credible witnesses to appear in a United States District Court. As discussed at length in this court's 120-page order, Hollenbeck's life is filled with lies, fraud, and forgery. Second, Hollenbeck recanted his trial testimony approximately eight years after Bartko's trial and when he had nothing left to lose. See, e.g., Johnson, 487 F.2d at 1279–80; United States v. Henry, 821 F.

37

Supp. 2d 249, 259 (D.D.C. 2011). Third, copious amounts of other evidence supported Hollenbeck's trial testimony concerning Bartko's knowledge of Hollenbeck's fraudulent fundraising tactics. See [D.E. 246] 3–79 (describing the mountain of evidence presented during Bartko's trial including Bartko's own incredible testimony). Fourth, and the court is not making this up, Hollenbeck recanted his recantation testimony. On April 26, 2018, Inspector Carroll interviewed Hollenbeck. See [D.E. 346, 346-1]. Hollenbeck stated under penalty of violating 18 U.S.C. § 1001 that his testimony at trial, and the statements he made to investigators and the government pre-trial, were the truth. See [D.E. 346-1] 4. On this record, no factfinder in this section 2255 proceeding could credit anything that Hollenbeck says. Thus, the court rejects Bartko's contention that this court must accept Hollenbeck's recantation testimony as credible and accurate. Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the [witness's] testimony is correct."); see Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999); In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011); Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990).[13]

In any event, even assuming Hollenbeck's recantation statements are true (which the court could never find to be true due to the inability to credit anything Hollenbeck says), Bartko's claim still fails. The court does not need to decide whether the "reasonable probability" or the "jury might

---

[13] Having presided over Bartko's thirteen-day trial, this court had ample opportunity to assess Hollenbeck's credibility. Based on the court's familiarity with Bartko's case and Hollenbeck, an evidentiary hearing to assess Hollenbeck's credibility is unwarranted. See, e.g., United States v. Arledge, 597 F. App'x 757, 758–59 (5th Cir. 2015) (per curiam) (unpublished); Shah v. United States, 878 F.2d 1156, 1158–59 (9th Cir. 1989); United States v. Kearney, 682 F.2d 214, 220–21 (D.C. Cir. 1982). Moreover, Bartko is not entitled to an evidentiary hearing because, even if the court found Hollenbeck's recantation credible (which it does not), Bartko would not be entitled to relief. See, e.g., United States v. Terry, 366 F.3d 312, 314–15 (4th Cir. 2004).

have reached a different conclusion" standard concerning recantation testimony applies because Bartko's claim fails under both standards. Compare Roberts, 262 F.3d at 293, with Garnett v. Clarke, No. 7:14CV00452, 2015 WL 7571949, at *4 (W.D. Va. Nov. 24, 2015) (unpublished).[14] Bartko continues to assert that "Hollenbeck was the prosecution's key witness against Bartko" despite this court's and the Fourth Circuit's rejection of that argument. [D.E. 340] 9. As this court explained:

> In its initial closing argument, the government described Hollenbeck as a man who had told hundreds of lies hundreds of times. The government then reiterated that the case against Bartko was built on the other evidence presented at trial, including a mountain of documents, the testimony of other witnesses, and Bartko's own incredible testimony. In response, the defense attempted to make the whole case turn on Hollenbeck's credibility and urged the jury to remove Hollenbeck's entire testimony from its consideration. In its rebuttal argument, the government espoused a similar approach, explicitly—and quite properly—arguing that Hollenbeck's testimony was not needed at all to return a guilty verdict on any count. Rather, the government argued that the mountain of evidence arising from the documents, the testimony of other witnesses, and Bartko's own contradictory testimony proved Bartko's guilt beyond a reasonable doubt.

[D.E. 246] 108; see Bartko, 728 F.3d at 337–41. Indeed, Hollenbeck further demonstrated his complete and utter lack of credibility by recanting his recantation testimony. This court, having presided over Bartko's thirteen-day trial and having again reviewed every piece of evidence, concludes that, in light of the entire case, Hollenbeck's recantation testimony would not have made any difference in Bartko's trial.

Bartko's remaining allegations also fail. Bartko offers no evidence (other than Hollenbeck's completely incredible statements to Bartko's investigators) to support his bald claims that the government knowingly used Hollenbeck's "perjured" testimony, that the government encouraged

---

[14] Bartko argues that the government knowingly used "false" and/or "perjured" testimony that created a false impression of material fact. See [D.E. 340] 30–31; [D.E. 345] 11–12. As stated, Bartko fails to show that Hollenbeck's testimony was perjured, let alone that the government knew of the alleged falsity. See Agurs, 427 U.S. at 103.

39

Hollenbeck to implicate Bartko, or that the government in any way encouraged Hollenbeck to testify falsely. Accordingly, the court denies Bartko's supplemental section 2255 claim.

IV.

As for Bartko's motion for discovery, a habeas petitioner "is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Rule 6 of the Rules Governing 2255 Proceedings provides:

> A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law. If necessary for effective discovery, the judge must appoint an attorney for a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A.

R. Governing Section 2255 Cases 6(a). Good cause exists where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." Bracy, 520 U.S. at 908–09 (quotation and alteration omitted); see Stephens v. Branker, 570 F.3d 198, 213 (4th Cir. 2009); Ramey v. United States, No. RWT-14-106, 2014 WL 12661574, at *1 (D. Md. Feb. 14, 2014) (unpublished). Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004) (quotation omitted).

Bartko requests: (1) a "complete set" of Special Agent Fleming's and Inspector Carroll's notes from 20 alleged witness interviews, and FBI 302 reports and MOIs from 14 alleged witness interviews; (2) FBI Special Agent Orin Sprague's notes from his alleged interview with John Colvin; (3) Inspector Carroll's handwritten notes from May 27, 2009, and June 3, 2010, and e-mails from AUSA Wheeler or AUSA Bragdon to case agents concerning witness interviews; (4) field notes and interview reports from interviews conducted with victims before Bartko's sentencing; (5) "[i]nvestigative records" concerning a real-estate development Ponzi scheme conducted by Plummer,

Leamon, and Hollenbeck; (6) "[a]ny handwritten notes or materials delivered to case agents, AUSA Wheeler or AUSA Bragdon by either of the Hollenbecks, or their counsel, in preparation for their debriefing on April 21–22, 2009 and for any such materials following the debriefing"; (7) e-mail communications among Alex Rue, David McClellan, Gannon Lasseigne, AUSA Wheeler, S. Gregory Hayes (or his counsel), and David Dantzler concerning the broker-dealer examination of Capstone; (8) e-mail communications among C. Scott Holmes, AUSA Wheeler, Scott Hollenbeck, or any case agent concerning any benefits or inducement that the Hollenbecks received in exchange for their cooperation with the government; (9) drafts or any other materials or communications concerning two tolling agreements between the government and Levonda Leamon; (10) file materials concerning Randolph James's representation of Leamon, Plummer, or Legacy; (11) e-mail communications among Scott Hollenbeck, Crystal Hollenbeck, and C. Scott Holmes "between the date of Hollenbeck's conviction in the Eastern District of North Carolina and the approval of the Rule 35(b) sentence reduction motion heard by the court on or about May 31, 2011"; (12) a copy of the video recording of Hollenbeck's investment presentation; (13) a copy of the government's Rule 35(b) motion for a reduction of Hollenbeck's sentence; (14) "[c]opies of email communications originated by former AUSA Wheeler or AUSA Bragdon that related to the preparation and delivery of his declaration dated July 15, 2011 and thereafter filed with the Clerk in Bartko's prosecution on a post-conviction basis"; and (15) a copy of the Department of Justice's Office of Professional Responsibility's final report concerning its investigation of AUSA Wheeler and any responsive materials submitted by AUSA Wheeler or the United State's Attorney's Office for the Eastern District of North Carolina during the investigation. See [D.E. 330-2].

Bartko's request is a fishing expedition. First, Bartko has not shown that the discovery materials he requests even exist. See, e.g., United States v. Wilson, 901 F.2d 378, 381–82 (4th Cir.

1990). Second, Bartko has not shown that the alleged discovery materials contain any exculpatory or impeaching information. In any event, Bartko's discovery request is deficient because "he has not demonstrated that such discovery would result in him being entitled to habeas relief." Stephens, 570 F.3d at 213. Rather, similar to his section 2255 motion, Bartko makes broad and conclusory allegations devoid of factual support. See [D.E. 330] 9–13. Indeed, Bartko does not cite record evidence to support his claims.[15] Bartko also continues to request investigative materials concerning Hollenbeck. As this court and the Fourth Circuit made clear, Hollenbeck's credibility was completely and thoroughly destroyed at trial. No additional evidentiary materials concerning Hollenbeck's credibility could have made any difference at Bartko's trial. See Bartko, 728 F.3d at 337. Furthermore, Bartko's claim that the government assured him that he would receive "open file" discovery does not change this outcome. See, e.g., Greatwalker, 356 F.3d at 911–12. Accordingly, the court denies Bartko's motion for discovery.

## V.

In sum, the court GRANTS the government's motion for summary judgment [D.E. 321], DENIES Bartko's cross-motion for partial summary judgment [D.E. 327], DENIES Bartko's motion for discovery [D.E. 330], DENIES Bartko's motion for leave to file supplemental Brady claims [D.E. 339], GRANTS the government's motion to dismiss [D.E. 343], DENIES Bartko's section 2255 motions [D.E. 292, 295, 339], DISMISSES Bartko's claims, and DENIES a certificate of appealability. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000). The clerk shall close the case.

---

[15] Bartko cites Inspector Carroll's handwritten notes, [D.E. 310-1], but Carroll's notes do not support Bartko's claims.

SO ORDERED. This **2** day of November 2018.

JAMES C. DEVER III
United States District Judge